S11G1828. WMW, INC. v. AMERICAN HONDA MOTOR
COMPANY, INC. et al.

(733 SE2d 269)

NAHMIAS, Justice.

We granted certiorari to decide whether, in *WMW, Inc. v. American Honda Motor Co.*, 311 Ga. App. 1 (714 SE2d 689) (2011), the Court of Appeals correctly construed the standing requirement for a motor vehicle dealership to sue under OCGA § 10-1-664, the anti-encroachment provision of the Georgia Motor Vehicle Franchise Practices Act, Ga. L. 1993, pp. 1585-1647, which is codified as amended at OCGA §§ 10-1-620 to 10-1-670. Like other statutes, the Franchise Practices Act must be construed as an integrated whole. See *U. S. Bank Nat. Assn. v. Gordon*, 289 Ga. 12, 14-15 (709 SE2d 258) (2011). While the anti-encroachment provision could have been drafted more clearly, we believe that the Act as a whole, and particularly its definitions provision, OCGA § 10-1-622, elucidate the proper application of the anti-encroachment provision to the facts of this case. The "relevant market area" for a corporate motor vehicle dealership like appellant WMW, Inc. ("WMW"), whose status as a "dealership" and "dealer" under the Act is based solely on its *sales* of new motor vehicles, is calculated from the location where WMW sells (markets) new vehicles in Roswell, Georgia, not from where WMW only services vehicles in Alpharetta. Because the new dealership that appellees American Honda Motor Company, Inc. (Honda) and Sobh Automotive of Cumming, Inc. (Sobh) planned to establish in Cumming was beyond WMW's relevant market area, WMW lacks standing to sue to block the new competitor under OCGA § 10-1-664. Thus, while we disagree with the rationale of the majority opinion below, it reached the right result, and we therefore affirm the Court of Appeals' judgment. See *Bunn v. State*, 291 Ga. 183, 193 (728 SE2d 569) (2012) (affirming on certiorari under the right-for-any-reason doctrine).

1. Since 1976, WMW, which does business as Honda Carland, has operated a new motor vehicle dealership in Roswell under a franchise agreement with Honda. WMW sells and services vehicles at its Roswell location. Since 2000, WMW has also operated a service-only location in Alpharetta under an amendment to the franchise agreement. In 2010, Honda notified WMW that it planned to authorize Sobh to open a new Honda dealership in Cumming, which would be more than eight miles from WMW's sales and service location in Roswell but within eight miles of WMW's service-only location in Alpharetta. WMW sued Honda and Sobh under the anti-encroachment provision of the Franchise Practices Act, which authorizes an existing dealership to file suit to prevent its franchisor from establishing a new or relocated dealership within the existing dealership's "relevant

market area." OCGA § 10-1-664 (b). The Act defines "relevant market area" as "the area located within an eight-mile radius of an existing dealership." OCGA § 10-1-622 (13.1). The trial court concluded that WMW lacked standing under the Act and dismissed the case.

WMW appealed, and the Court of Appeals affirmed by vote of five to two. The majority opinion rejected WMW's argument that its service-only location in Alpharetta qualified for its own eight-mile relevant market area. See *WMW, Inc.*, 311 Ga. App. at 4. The majority identified WMW's "dealership" location for calculating its "relevant market area" by looking to the " 'general rule of law' " that, for venue purposes, " 'a domestic corporation resides where its principal office or place of business is situated,' " which for WMW was its Roswell location. Id. (citation omitted). The majority therefore affirmed the trial court's ruling that WMW lacked standing to sue under the anti-encroachment provision. See id. at 5.

The dissent pointed out that corporations, unlike natural persons, can exist in more than one place at a time; contended that the Act protects multiple locations for an existing dealership where the dealer is an individual rather than a corporation; and saw nothing in the Act that suggested that the anti-encroachment provision was designed to provide less protection to corporate dealers than to individual dealers. See *WMW, Inc.*, 311 Ga. App. at 5-6 (McFadden, J., dissenting). Thus, the dissent concluded that WMW's relevant market area should be measured from every location where the corporation exists, including its service-only location in Alpharetta, which would give WMW standing to sue to try to block Honda and Sobh from establishing a competing franchise in Cumming, less than eight miles from WMW's Alpharetta location. See id.

This Court granted certiorari.

2. Before considering the merits of the case, we must address a jurisdictional issue. See *Scarbrough Group v. Worley*, 290 Ga. 234, 236 (719 SE2d 430) (2011). After briefing and oral argument in this Court, Honda filed a motion to dismiss this case as moot, attaching a letter it sent to WMW about a month after oral argument. The letter says, "At this time, [Honda] no longer intends to appoint an authorized Honda dealer at the site" in Cumming that WMW has challenged. WMW and Sobh do not oppose Honda's motion to dismiss, although WMW asks us to vacate the decisions of the Court of Appeals and trial court if we grant the motion, as is normally done when a case becomes moot by happenstance during an appeal. See, e.g., *United States v. Munsingwear, Inc.*, 340 U. S. 36, 41 (71 SC 104, 95 LE 36)

(1950) (explaining that this is done "to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences").[1] Here, however, the event purportedly making this appeal moot is not happenstance, but rather the voluntary and unilateral decision by Honda, a party that prevailed below, to stop, at least for the time being, its challenged effort to establish a new dealership in Cumming.

This is apparently a novel mootness issue for Georgia's appellate courts, but it is an issue that long has been settled in the federal courts, using reasoning that makes good sense and that we now adopt. An appellee's "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Svc. Employees Intl. Union*, 576 U. S. ___, ___ (132 SC 2277, 2287, 183 LE2d 281) (2012) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U. S. 283, 289 (102 SC 1070, 71 LE2d 152) (1982)).

A narrow exception to the voluntary cessation doctrine exists where the "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.*, 393 U. S. 199, 203 (89 SC 361, 21 LE2d 344) (1968). But the " 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs. (TOC), Inc.*, 528 U. S. 167, 189 (120 SC 693, 145 LE2d 610) (2000) (citation omitted). The "public interest in having the legality of the practices [at issue] settled" may also militate against a finding of mootness in a particular appeal. *United States v. W.T. Grant Co.*, 345 U. S. 629, 632 (73 SC 894, 97 LE 1303) (1953).

Honda has not carried this heavy burden. To the contrary, Honda's letter to WMW says frankly that Honda has decided not to engage in the challenged conduct only "[a]t this time." Were we to dismiss this case, nothing would prevent Honda (and Sobh) from once again planning to establish a new dealership at the Cumming location, and nothing would prevent WMW from again filing suit to block

---

[1] We emphasize that we have not been presented with a joint motion of the parties to dismiss the writ of certiorari because they have reached a settlement of their dispute, which is a disposition this Court generally encourages – but one that leaves the opinions below intact, rather than allowing the parties to take them off the books. See *U. S. Bancorp Mtg. Co. v. Bonner Mall Partnership*, 513 U. S. 18, 25 (115 SC 386, 130 LE2d 233) (1994) ("Where mootness results from settlement, . . . the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur.").

that plan, requiring the courts to consider the same issue all over again. In addition, the legal issue presented is important, and not only for these parties; that is why we granted certiorari to decide it. See Supreme Court Rule 40 ("A petition for the writ [of certiorari] will be granted only in cases of great concern, gravity, or importance to the public.").[2] An appellee's "post-certiorari maneuvers designed to insulate a decision from review . . . must be viewed with a critical eye." *Knox*, 132 SC at 2287. For these reasons, Honda's motion to dismiss the appeal as moot is denied, and we turn to the merits.

3. (a) In 1992, the Georgia Constitution was amended to expressly authorize the General Assembly

> to regulate . . . new motor vehicle manufacturers, distributors, dealers, and their representatives doing business in Georgia, including agreements among such parties, in order to prevent frauds, unfair business practices, unfair methods of competition, impositions, and other abuses upon its citizens.

Ga. Const. of 1983, Art. III, Sec. VI, Par. II (c).[3] The next year, the General Assembly invoked its new constitutional authority when it "substantively reenact[ed]" the Franchise Practices Act. Ga. L. 1993, p. 1586, § 1. The Act balances the public interest in "full and fair competition among dealers and others" against the need to maintain "strong and sound dealerships." OCGA § 10-1-621 (3), (4). The Act's anti-encroachment provision, OCGA § 10-1-664, which authorizes dealerships to file suit if their franchisors attempt to establish or relocate another dealership in the same area, is part of this balance between competition and protection of existing motor vehicle dealers.[4]

---

[2] We note in this respect that briefs amicus curiae have been filed in this Court by the Georgia Automobile Dealers Association and the Pacific Legal Foundation.

[3] The constitutional amendment was needed to overcome decisions of this Court striking down previous statutes regulating motor vehicle franchise practices as violating due process and the constitutional provision barring legislation authorizing agreements that lessen competition. See, e.g., *Ga. Franchise Practices Comm. v. Massey-Ferguson, Inc.*, 244 Ga. 800, 801-802 (262 SE2d 106) (1979); *Gen. GMC Trucks, Inc. v. Gen. Motors Corp.*, 239 Ga. 373, 375-377 (237 SE2d 194) (1977). Indeed, the amendment specified that this grant of power to the General Assembly was not limited by the constitutional provisions that litigants had relied on to challenge previous motor vehicle franchise laws. See Ga. Const. of 1983, Art. III, Sec. VI, Par. II (c) ("Notwithstanding the provisions of Article I, Section I, Paragraphs I, II, and III or Article III, Section VI, Paragraph V (c) of this Constitution, the General Assembly in the exercise of its police power shall be authorized . . . .").

[4] While we recognize these expressed purposes of the Act, we pay no heed to the parties' competing policy arguments to the extent that they generalize from the stated purposes rather than focus on the text of the relevant statutory provisions.

OCGA § 10-1-664 provides in relevant part as follows:

> (a) Any franchisor which intends to establish a new dealership or to relocate a current dealership for a particular line-make motor vehicle within the relevant market area of an existing dealership of the same line-make motor vehicle shall give written notice of such intent by certified mail or statutory overnight delivery to such existing dealership. . . .
>
> (b) Any existing dealership in whose relevant market area a franchisor intends to establish a new dealership or to relocate a current dealership may within 60 days of the receipt of the notice petition a superior court to enjoin or prohibit the establishment of the new or relocated dealership within the relevant market area of the existing dealership. The court or other tribunal of competent jurisdiction shall enjoin or prohibit the establishment of the new or relocated dealership within the relevant market area of the existing dealerships unless the franchisor can prove by a preponderance of the evidence that the existing dealership is not providing adequate representation of the line-make motor vehicle in the existing dealership's relevant market area and that the new or relocated dealership is necessary to provide the public with reliable and convenient sales and service within the relevant market area. . . .

Two terms that the Act specifically defines — "dealership" and "relevant market area" — appear repeatedly in OCGA § 10-1-664 and thus are essential to understanding the operation of the anti-encroachment provision. The Act defines "relevant market area" as "the area located within an eight-mile radius of an existing dealership." OCGA § 10-1-622 (13.1). And for corporations and other business organizations, "dealership" is defined simply as the "dealer," OCGA § 10-1-622 (2) (A), so that term is also important in determining the scope of OCGA § 10-1-664.

The Act defines "dealer" in two different ways. See OCGA § 10-1-622 (1). First, a dealer is

> any person *engaged in the business of selling*, offering to sell, soliciting, or advertising the sale of new motor vehicles and who is licensed or otherwise authorized to utilize trademarks or service marks associated with one or more makes of motor vehicles in connection with such sales.

Id. (emphasis added). Alternatively, a dealer is

> any person who *engages exclusively in the repair* of motor vehicles, except motor homes, if such repairs are performed pursuant to the terms of a franchise or other agreement with a franchisor or such repairs are performed as part of a manufacturer's or franchisor's warranty.

Id. (emphasis added).[5]

(b) Thus, a corporate "dealership" — which, by virtue of OCGA § 10-1-622 (2) (A), is synonymous with a corporate "dealer" — is defined by the *activity* that makes the corporation a dealer in the first place. In other words, there are what we will call "car-selling dealers," and there are "exclusively-repairs dealers." WMW both sells and repairs Honda vehicles pursuant to its franchise agreement. Accordingly, WMW does not qualify as an "exclusively-repairs dealer," because WMW does not "engage[ ] *exclusively* in the repair of motor vehicles." OCGA § 10-1-622 (1) (emphasis added). Instead, WMW is a "car-selling dealer," that is, it qualifies as a "dealer" and a "dealership" under the Act *only* because it "engage[s] in the business of selling . . . new motor vehicles." Id.[6] Indeed, the amendment of the Franchise Practices Act in 1999, see Ga. L. 1999, p. 1194, § 1, to add the second, repair-oriented definition of "dealer," with its emphatic "exclusively" qualifier, suggests that dealers who both sell and service are to be measured only by their sales locations.[7]

As a "car-selling" dealer, WMW's "relevant *market* area" is read most naturally to mean the eight-mile radius around the location or locations where it performs the only activity that qualifies it as a "dealer" and "dealership" under the Act, that is, where it *sells* new vehicles pursuant to its franchise agreement with Honda. It would be awkward to read the term "relevant *market* area," as applied to a

---

[5] The Act excludes from its "dealer" definition "any person engaged solely in the business of selling used motor vehicles." Id.

[6] We recognize that most car-selling dealers also service vehicles at the same or separate locations. But the Act's first definition of "dealer," while referring to "selling," "sell," "sale," and "sales," notably omits any reference to "service" or "repairs," even though the statute uses the terms "sales" and "service" together in other places, including in the anti-encroachment provision. See, e.g., OCGA §§ 10-1-623 (f), 10-1-664 (b). This connotes a particular focus on the sales activity of dealers who are such because of that activity, even if most of them also have a service facility at the same or another location.

[7] Only a "person" can be a dealer, see OCGA § 10-1-622 (1), and the only "person" in this case with an existing dealership is the single corporation, WMW. WMW's service-only facility in Alpharetta is not organized or operated as a separate legal person, and it therefore cannot be a "dealer" or "dealership" separate from WMW and entitled to a "relevant market area" on that ground.

car-selling dealer, to mean anything else. The "market" at issue is car sales, not repairs. Thus, a car-selling dealer's "relevant *market* area" does not extend to other locations where the dealership performs repairs (or engages in other corporate activities), because those activities are not what make a car-selling dealer a dealership under the Act.

(c) Other terms of the anti-encroachment provision reinforce this conclusion. Under OCGA § 10-1-664 (b), a franchisor may only establish a new or relocated dealership within an existing dealership's relevant market area if the franchisor proves, with respect to that relevant market area, both that "the existing dealership is not providing adequate representation" of the franchisor's line-make vehicles, and that the additional dealership is "necessary to provide the public with reliable and convenient sales and service" within the market area. OCGA § 10-1-664 (b). Both prongs of this test make sense if the relevant market area protects only the location(s) where the existing dealership performs the function that makes it a dealership — that is, where the car-selling dealer sells cars, or where the exclusively-repairs dealer repairs cars. The alternative readings advanced by the parties and adopted by the majority and dissenting opinions in the Court of Appeals make little if any sense when applied to this provision.

A hypothetical corporate car-selling dealer — let's call it "Atlanta Cars" — helps to illustrate the problems with the competing interpretations. Assume that Atlanta Cars has three separate facilities — a corporate headquarters in downtown Atlanta and two dealership facilities in outlying suburbs where it sells new cars. According to WMW and the dissent below, OCGA § 10-1-664 (b) gives a corporate dealer standing anywhere the corporation exists, even if it does not market cars or repair services in those places. Thus, Atlanta Cars would have a "relevant market area" around its downtown headquarters simply because the corporation exists there; if its franchisor wanted to add a new dealer to serve the growing in-town market, Atlanta Cars would have standing to force the franchisor into litigation, even though the dealer's claim would be frivolous, since Atlanta Cars would have no hope of showing that it was adequately representing its franchisor or serving the public at its headquarters, where it does not sell cars or services and is essentially invisible to the public. The phrase "relevant *market* area" cannot fairly be read to protect locations where a dealer markets nothing.

On the other hand, Honda argues that a dealer's relevant market area protects only the dealer's "primary location" — a term notably not used anywhere in the Franchise Practices Act. Honda's reading would force the court to choose arbitrarily which one of Atlanta Cars'

three locations was "primary." The court might reasonably choose the dealer's corporate headquarters in downtown Atlanta, thereby excluding the only locations where the dealer actually markets the new cars whose sales make it a "dealer" and "dealership" under the Act. Or if the court did not select the corporate headquarters as Atlanta Cars' "primary location," how would it choose between the two suburban locations where the dealer actually sells cars? Honda provides no answer. The same analysis applies to the focus of the Court of Appeals' majority on the corporation's "principal office or place of business," *WMW, Inc.*, 311 Ga. App. at 4 — a phrase that also does not appear in the Act. There is no reason to think that the anti-encroachment provision protects one car-selling facility but not another (much less an administrative or management location over a car-selling location), as Honda's argument and the majority opinion below require.

OCGA § 10-1-664 (b) also directs courts to 11 factors to consider in making the two-fold determination of franchisor representation and public service required to deny an injunction against a new dealership to an existing dealership with standing. Several of these factors further indicate that the "relevant market area" protects the place or places where a car-selling dealer like WMW sells cars. For example, factor six is the "[d]istance, travel time, traffic patterns, and accessibility between the existing dealership . . . and the location of the proposed . . . dealership." OCGA § 10-1-664 (b) (6). The travel time between an existing dealership and a proposed new dealership is obviously important in determining how the existing dealership's sales will be affected by the addition of a competitor, but this provision makes no sense if the dealership is understood to exist everywhere it has a business asset like an item of inventory or a business card, as WMW and the dissent below's approach would entail. See Division 4 (b) below. It is also hard to understand why the traffic patterns between a corporate dealer's headquarters or registered office and the location of a proposed new dealership should matter. See Division 4 (a) below.

Other factors that are explicitly tied to competition reinforce the notion that in determining the relevant market area, we must look to the location of the activity that makes the dealer a "dealer" and a "dealership" under the Act. Thus, factor one relates to "[t]he impact that the establishment of the new or relocated dealership will have on . . . the existing dealership," and factor three concerns "[t]he reasonably expected market penetration of the line-make motor vehicle for the relevant market area involved, after consideration of" specified factors, with a catch-all for any "other factors affecting sales to consumers in the relevant market area." OCGA § 10-1-664 (b) (1), (3). Factor nine asks "[w]hether there is adequate interbrand and

intrabrand competition with respect to the line-make motor vehicles." OCGA § 10-1-664 (b) (9). And factor ten focuses on "economic and market conditions pertinent to dealerships competing in the relevant market area, including anticipated changes." OCGA § 10-1-664 (b) (10). The adequacy of competition is obviously relevant to the public's ability to buy new cars. Attempts to apply these competition-focused factors to locations beyond where a car-selling dealer sells cars quickly become absurd. In our hypothetical, for example, under WMW's argument, the court would have to apply these factors to Atlanta Cars' corporate headquarters, where the dealer does not sell cars. It is hard to imagine how a court could do so intelligibly.

(d) Other parts of the Franchise Practices Act similarly suggest that a dealer's "relevant market area" corresponds to where it operates its dealership in terms of marketing its products and services. For example, the Act makes it illegal for a franchisor to prohibit a dealer from "adding a sales or service operation for another line make of motor vehicles at the same or expanded facility at which the dealer currently operates a dealership." OCGA § 10-1-662 (a) (17). The Franchise Practices Act's venue provision also illustrates the statute's focus on the place where a car-selling dealer conducts its sales business. In cases brought by dealers against corporate franchisors for violations of the franchise agreement or the Act, venue is proper not only under the general laws for corporate venue, but also "in the county in which the dealer engaged in the business of *selling* the products or services of such . . . franchisor." OCGA § 10-1-623 (f) (emphasis added). Our holding that a car-selling dealer is located where it sells the franchisor's cars, and an exclusively-repairs dealer is located where it repairs the franchisor's cars, fits comfortably into these provisions, while the expansive view of WMW and the dissent below and the restrictive view of Honda, Sobh, and the majority below do not.

(e) WMW is a "dealer" and a "dealership" covered by the Franchise Practices Act solely because it sells new cars, and it is undisputed that WMW does not sell cars at its Alpharetta service-only location. Accordingly, WMW's protected "relevant market area" is the eight-mile radius around its Roswell new car sales location, which does not include the proposed site for Honda's new dealership in Cumming. Because the new dealership is outside WMW's relevant market area, WMW lacks standing under OCGA § 10-1-664 to sue to prohibit the new dealership.

4. (a) This result is the same reached by the Court of Appeals, but, as noted previously, we disagree with the core reasoning of the majority opinion. The majority opinion erred by relying heavily on general principles regarding where a corporation is deemed to "reside"

for venue purposes to determine the "relevant market area" of a corporate dealership under the Franchise Practices Act. See *WMW, Inc.*, 311 Ga. App. at 4. The majority said that " '[t]he general rule of law is that a domestic corporation resides where its principal office or place of business is situated.' " Id. (quoting *Citizens & Southern Bank v. Taggart*, 164 Ga. 351, 356 (138 SE 898) (1927), and citing OCGA § 14-2-510 (b) (1), (d)). Venue is a legal concept focused on where lawsuits may be filed, not the "market area" where existing car dealers should be able to resist competition. Where a corporation is deemed to "reside" for the purpose of being sued may depend on where the corporation has (or had previously) chosen to be sued by establishing a "registered office," where its "principal office" is (or was) located, where it has "an office" and transacts business, where it maintains its "principal place of business," or where its "corporate office or place of business" is located, as well as on the causes of action asserted.[8]

A corporation's registered office need not be the corporation's principal place of business, or, to focus on the context of this statute,

---

[8] Thus, the general corporation venue statute, OCGA § 14-2-510, provides, with emphasis added: . . .

(b) Each domestic corporation and each foreign corporation authorized to transact business in this state shall be deemed to reside and to be subject to venue as follows:

(1) In civil proceedings generally, in the county of this state where the corporation maintains its *registered office*; or if the corporation fails to maintain a registered office, it shall be deemed to reside in the county where its *last named registered office or principal office*, as shown by the records of the Secretary of State, was maintained;

(2) In actions based on contracts, in that county in this state where the contract to be enforced was made or is to be performed, if the corporation has *an office and transacts business* in that county;

(3) In actions for damages because of torts, wrong, or injury done, in the county where the cause of action originated, if the corporation has *an office and transacts business* in that county;

(4) In actions for damages because of torts, wrong, or injury done, in the county where the cause of action originated. If venue is based solely on this paragraph, the defendant shall have the right to remove the action to the county in Georgia where the defendant maintains its *principal place of business*. . . . ; and

(5) In garnishment proceedings, in the county of this state in which is located the *corporate office or place of business* where the employee who is the defendant in the main action is employed.

(c) Any residences established by this Code section shall be in addition to, and not in limitation of, any other residence that any domestic or foreign corporation may have by reason of other laws.

(d) Whenever this chapter either requires or permits a proceeding to be brought in the county where the registered office of the corporation is maintained, if the proceeding is against a corporation having a principal office as required under a prior general corporation law, the action or proceeding may be brought in the county where the *principal office* is located.

the place or places where the corporation *markets* its products or services. See OCGA § 14-2-510 (b) (1). It would be nonsensical to say that the "relevant market area" for a dealership that sells new cars only in Valdosta is the eight miles around its registered office, which could be in Macon or Atlanta. The majority opinion below also would limit a car-selling dealer to a single location even if it sold new cars at multiple locations pursuant to its franchise agreement. To the extent venue sheds light on the question at hand, we would look, as discussed in Division 3 (d) above, to the Franchise Practices Act's own venue provision, which specially authorizes dealers to sue franchisors based on where the dealer "engaged in the business of *selling* the products or services of such . . . franchisor," OCGA § 10-1-623 (f) (emphasis added), in addition to the venue provided by general laws.

To be sure, as with WMW, a corporate dealer's registered office or principal place of business may be the same (and the only) place that a car-selling dealer sells new cars, so the result may often be the same under the Court of Appeals' analysis as under ours. But that may not always be true, and we believe our holding is truer to the terminology and full context of the Franchise Practices Act.

(b) WMW and the dissent below focus on the Act's definition of "dealership" for *individual* dealers, which is expansive:

> "Dealership" means . . . [a]ll business assets used in connection with the dealer's business pursuant to the franchise including, but not limited to, the dealership facilities, the franchise, inventory, accounts receivable, and good will if the dealer is an individual.

OCGA § 10-1-622 (2) (B). They argue that because corporate dealers like WMW may exist in more than one place at a time, and because the Act defines dealerships in the context of individual dealers in such capacious terms, the "relevant market area" for a corporate dealership should be similarly expansive. We reject this argument.

To begin with, instead of defining *all* "dealerships" in the broad terms used for individual dealers, the General Assembly specifically defined "dealership" for corporations separately and solely by reference to the statutory definition of "dealer." OCGA § 10-1-622 (2) (A). And as explained above, the Act's two categories of "dealer[s]," and thus of corporate "dealership[s]," are defined by reference to a specific *activity* — selling new cars or exclusively repairing cars, see OCGA § 10-1-622 (1) — in distinct contrast to the definition of an individual dealership, which focuses on his or her *business assets*. We see no good

reason to seek guidance from the definition of an individual dealership when the statute expressly separates corporate dealerships, like the one at issue here, from that definition.

Nor in any event can we readily accept the argument that everywhere an individual dealer, much less a corporate dealer, has a "business asset" is the center point of an eight-mile "relevant market area" in which the dealer is entitled to resist new competition. One of the assets specifically listed in the individual dealership definition, "goodwill," is intangible, and others, like the "franchise [agreement]" and "accounts receivable" are pieces of paper or even electronic records whose location may have nothing to do with where the dealer conducts business, much less where it markets goods or services. Similarly, a dealer's "inventory" may include cars parked in lots or on the back of transport trucks far away from where the dealer is selling or repairing vehicles. Indeed, the view of WMW and the dissent below would create floating eight-mile "relevant market areas" around each car that a dealer allows a customer to take out on a test drive or home to try for a day or two, wherever the vehicle went. The "business assets used in connection with the dealer's business" could also encompass such things as the dealer's and all his employees' mobile phones, business cards, and similar items kept on or near those people, creating further floating eight-mile "relevant market areas" wherever those items were driven around, taken home, or brought on vacations. The Court of Appeals' dissent indicated that the locations of a corporate dealer should be determined with equal breadth. But a corporation's "business assets" will often be even more expansive than an individual's, making the absurdity of this approach even more evident.

Indeed, if a corporate (or individual) dealership's location, in calculating its "relevant market area," includes all places where the dealer has a business asset, it often would be impossible for a franchisor to comply with OCGA § 10-1-664 (a), which requires that notice of a proposed new dealership be sent "by certified mail or statutory overnight delivery to [the] existing dealership." Moreover, the notice must also include "[t]he specific location of the additional or relocated dealership; . . . [and] [t]he identity of all existing dealerships in whose relevant market area the new or relocated dealership is to be located." OCGA § 10-1-664 (a) (1) and (3). Satisfying these requirements would be impossible in WMW's proposed world of eight-mile "relevant market areas" floating around every item of inventory, every business card, and the dealer's goodwill.

We are not sure why the term "dealership" was defined so expansively for individual dealers. The appellees suggest that it was meant to distinguish an individual dealer's personal assets from the

dealership's assets, or to indicate that a car-selling individual dealer, like a car-selling corporate dealer, may sell cars from multiple locations under the terms of a particular franchise agreement. Because this case involves only a corporate dealer, we need not definitively resolve what the "relevant market area" is for an individual dealership, and no court may ever have to resolve that issue.[9] But we will not look to the individual dealership definition when doing so is contrary to the separate definition provided for corporate dealerships and produces an interpretation of "relevant market area" so contrary to the natural meaning of that phrase and the sensible operation of OCGA § 10-1-664 and other provisions of the Franchise Practices Act.

5. To sum up, under the Georgia Motor Vehicle Franchise Practices Act, a corporate dealership's "relevant market area" — the area for which the dealer has standing to resist competition by a new or relocated dealership of the same franchisor — is the area located within an eight-mile radius of where a dealer qualified as such because it is "engaged in the business of selling . . . new motor vehicles" sells those vehicles, or where a dealer qualified as such because it "engages exclusively in the repair of motor vehicles" repairs vehicles. For WMW, which is a corporate new car dealer, that location is in Roswell. WMW does not sell cars at its service center in Alpharetta, nor is WMW exclusively engaged in repairs. Thus, WMW had no standing to challenge Honda and Sobh's proposed new dealership in Cumming.

*Judgment affirmed. All the Justices concur, except Melton, J., who concurs specially.*

MELTON, Justice, concurring specially.

While I agree with the ultimate conclusion reached by the majority, I write separately to focus on the core issues that need to be resolved, rather than parse every argument made by the parties and the Court of Appeals.

Specifically, in order to address the issue of standing, we need only decide what the Legislature intended to include as the eight-mile "relevant market area" with respect to a corporate car "dealership." See OCGA §§ 10-1-622 (1), (2), and (13.1); 10-1-664 (b). By deciding that issue alone, it becomes clear that the dealer in this particular case, WMW, did not have standing to sue to prevent its franchisor, Honda, from adding a new dealership in Cumming, as Honda's

---

[9] Honda says in its opening brief that "references [in the Act] to a dealership owned as a sole proprietorship are becoming mostly academic, as the vast majority of automotive dealerships are now owned as corporations, LLCs, or a similar type of business form."

Cumming dealership fell outside of WMW's protected eight-mile "relevant market area."

The "relevant market area" in which an existing dealership may potentially restrict a franchisor from opening a new dealership is "the area located within an eight-mile radius of [the] existing dealership." OCGA § 10-1-622 (13.1). A corporate "dealership" for purposes of the Georgia Motor Vehicle Franchise Practices Act can be one of two types of entities:

> [1] any person[10] engaged in the business of selling, offering to sell, soliciting, or advertising the sale of new motor vehicles and who is licensed or otherwise authorized to utilize trademarks or service marks associated with one or more makes of motor vehicles in connection with such sales. . . .
> [or [2]] any person who engages *exclusively* in the repair of motor vehicles, except motor homes, if such repairs are performed pursuant to the terms of a franchise or other agreement with a franchisor or such repairs are performed as part of a manufacturer's or franchisor's warranty. . . .

(Emphasis supplied.) OCGA § 10-1-622 (1).

Here, as the majority correctly points out, WMW is a "dealership" because it "engage[s] in the business of selling . . . new motor vehicles." OCGA § 10-1-622 (1). It does not operate as an entity that is "engage[d] *exclusively* in the repair of motor vehicles," and therefore it could not qualify as a dealership on that basis. (Emphasis supplied.) Id. As such, the "relevant market area" with respect to WMW as a dealership could only be related to its activities as a *seller* of new motor vehicles.[11] Because WMW's Alpharetta repair facility is not a location that is engaged in WMW's business of selling new cars, and because it is undisputed that the repair facility is not a separate corporation from WMW,[12] the eight-mile "relevant market area" applicable to WMW's selling facilities has no application to its

---

[10] A corporation is considered to be the equivalent of a "person" for purposes of the Georgia Motor Vehicle Franchise Practices Act. See OCGA § 10-1-622 (1) and (2) (A). See also OCGA § 1-2-1 (a) and (b) ("There are two classes of persons: natural and artificial . . . . Corporations are artificial persons. . . .").

[11] I note that, because the definition of "dealership" in OCGA § 10-1-622 (1) speaks of persons (in this case, corporations) who *engage* in the business of selling new motor vehicles or who *engage* exclusively in the repair of motor vehicles, any analysis based on the mere location of corporate offices or based on legal venue provisions in an attempt to determine the "relevant market area" is irrelevant.

[12] Again, there is only one "person/corporation" relevant to our "dealership" inquiry here, and that is WMW. The fact that WMW may have several different facilities in various locations does not make the company itself more than one person/corporation.

Alpharetta repair facility. Accordingly, WMW has no standing to sue to prevent Honda from opening its proposed new dealership in Cumming.

For these reasons, I concur in the majority opinion and the result reached therein.

DECIDED OCTOBER 15, 2012.

*Bondurant, Mixson & Elmore, H. Lamar Mixson, Lisa R. Strauss, Naveen Ramachandrappa*, for appellant.

*Nelson, Mullins, Riley & Scarborough, Richard K. Hines V, C. Mitchell Brown, Strickland, Brockington & Lewis, Anne W. Lewis, Smith, Gambrell & Russell, William Van Hearnburg, Jr.*, for appellees.

*Freeman, Mathis & Gary, T. Bart Gary, Chance D. Weldon*, amici curiae.