NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1139. LUCID GROUP USA, INC. v. STATE OF GEORGIA et al.

COLVIN, Justice.

This case concerns the constitutionality of two provisions of the Georgia Motor Vehicle Franchise Practices Act, OCGA § 10-1-620 et seq. The first of these provisions, OCGA § 10-1-664.1(c), generally requires manufacturers to sell their new motor vehicles through a new motor vehicle dealer (specifically, a dealer with a franchise for such vehicles). It provides that "no manufacturer or franchisor shall offer to sell or sell, directly or indirectly, any new motor vehicle to a consumer in this state, except through a new motor vehicle dealer holding a franchise for the line make covering such new motor vehicle." OCGA § 10-1-664.1(c). The second of these provisions, OCGA § 10-1-664.1(a), generally prohibits manufacturers and their

affiliated entities from owning or operating a new motor vehicle dealer, providing that, as a general matter, it is "unlawful for any manufacturer … or any … affiliate … of a manufacturer … to own, operate, or control, directly or indirectly, more than a 45 percent interest in a dealer or dealership in this state." As a result of these two provisions (collectively referred to here as the "Direct Sales Prohibition"), new motor vehicle manufacturers and their affiliates generally cannot sell their vehicles in the state directly to consumers. If they wish to sell their new motor vehicles in the state to consumers, they must instead use an independent franchised dealer as an intermediary to facilitate the sale.

The plaintiff in this case, Lucid Group USA, Inc. ("Lucid"), operates retail locations in other states where it sells directly to consumers new electric vehicles manufactured by an affiliated entity (Lucid USA, Inc.). Seeking to open a retail location in Georgia, Lucid submitted an application for a dealership license to the Georgia Department of Revenue, which is tasked with licensing new motor vehicle dealers. But the Department of Revenue denied

Lucid's application based on the Direct Sales Prohibition.

Lucid then filed suit against the State, seeking declarations that, as applied to Lucid, the Direct Sales Prohibition violates several provisions of the Georgia Constitution, including the Due Process Clause,[1] the Equal Protection Clause,[2] and two provisions of Article III, Section VI, Paragraph IV of Georgia's Constitution ("Paragraph IV").[3] Lucid also sought a permanent injunction prohibiting the State from enforcing the Direct Sales Prohibition against Lucid.

The trial court, however, dismissed Lucid's complaint. The court concluded that Lucid's due process and equal protection claims were barred by Article III, Section VI, Paragraph II(c) of the Georgia Constitution of 1983 ("Paragraph II(c)"), which provides in relevant part that, "[n]otwithstanding the [Due Process Clause and the Equal

---

[1] Ga. Const. of 1983, Art. I, Sec. I, Par. I ("No person shall be deprived of life, liberty, or property except by due process of law.").

[2] Ga. Const. of 1983, Art. I, Sec. I, Par. II ("No person shall be denied the equal protection of the laws.").

[3] Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(a) (providing in relevant part that "[l]aws of a general nature shall have uniform operation throughout this state"); Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(c) ("No special law relating to the rights or status of private persons shall be enacted.").

Protection Clause] of this Constitution," the General Assembly is authorized to regulate specified members of the "new motor vehicle" industry "in order to prevent frauds, unfair business practices, unfair methods of competition, impositions, and other abuses upon its citizens." And the trial court concluded that Lucid had not stated a claim under Paragraph IV. Lucid appealed.

As explained below, we vacate the trial court's determination that Paragraph II(c) bars Lucid's due process and equal protection claims and remand for further consideration of that issue. As to the trial court's dismissal of Lucid's Paragraph IV claims, we affirm in part, vacate in part, and remand for further consideration.

1. Understanding the claims at issue in this case requires consideration of the history and operation of the Motor Vehicle Franchise Practices Act. In 1974, the General Assembly passed the Motor Vehicle Franchise Practices Act, legislation designed to regulate motor vehicle franchise practices "in order to prevent frauds, unfair practices, discrimination, and undue control of the independent motor vehicle dealer by motor vehicle manufacturing

4

and distributing organizations." Ga. L. 1974, pp. 134–35. See also *Gen. GMC Trucks, Inc. v. Gen. Motors Corp., GMC Truck & Coach Div.*, 239 Ga. 373, 373 (1977). Two years later, that legislation was repealed and replaced by the 1976 Franchise Practices Act. See *Gen. GMC Trucks*, 239 Ga. at 373–74.

The 1976 Franchise Practices Act promptly faced constitutional challenges. In 1977, we held that a provision of the Act that limited the number of franchised dealers, thereby limiting the available market for out-of-state manufacturers seeking to market their products in Georgia, violated the Commerce Clause of the United States Constitution. See *Gen. GMC Trucks*, 239 Ga. at 375–76, 378. In reaching this conclusion, we noted that the state generally "may regulate under the police power where the health, safety and welfare of its citizens are at stake," and that the legislature therefore may "regulate the purchase and sale of motor vehicles for the protection and general welfare of the public," including to protect the public from "fraud." Id. at 376, 379 (quotation marks omitted). But we noted that Georgia courts had

"traditionally limited the power of the state to regulate private business," that the police power does not authorize "purely anticompetitive" legislation, which is "not affected with the public interest," and that "the legislature … may not indulge in arbitrary price fixing, the destruction of lawful competition, or the creation of trade restraints tending to establish a monopoly." Id. at 376–77, 379 (quotation marks omitted).

The General Assembly "substantive[ly] re-enact[ed]" the 1976 Franchise Practices Act in 1979. *Georgia Franchise Pracs. Comm'n v. Massey-Ferguson, Inc.*, 244 Ga. 800, 801 (1979). That same year, we declared the 1979 Franchise Practices Act unconstitutional "in its entirety." Id. at 803. We concluded that provisions of the Act, which were not severable, violated several provisions of Georgia's 1976 Constitution, including Article I, Section I, Paragraph I (the Due Process Clause[4]), Article I, Section I, Paragraph VII (concerning

---

[4] Ga. Const. of 1976, Art. I, Sec. I, Par. I ("No person shall be deprived of life, liberty, or property, except by due process of law.").

laws that impair contracts[5]), Article III, Section I, Paragraph I (concerning legislative power[6]), Article I, Section II, Paragraph III (concerning impartial protection of persons and property[7]), and Article III, Section VIII, Paragraph VIII (concerning anti-competitive contracts[8]). See id. at 801–03. And in reaching this conclusion, we noted that the General Assembly had improperly "restrict[ed] competition" and sought "to regulate an industry not affected with a public interest." Id. at 801–02.

In 1992, following our rulings "striking down previous statutes

---

[5] Ga. Const. of 1976, Art. I, Sec. I, Par. VII ("No bill of attainder, ex post facto law, retroactive law, or law impairing the obligation of contracts, or making irrevocable grant of special privileges or immunities, shall be passed.").

[6] Ga. Const. of 1976, Art. III, Sec. I, Par. I ("The legislative power of the State shall be vested in a General Assembly ….").

[7] Ga. Const. of 1976, Art. I, Sec. II, Par. III ("Protection to person and property is the paramount duty of government, and shall be impartial and complete."). This provision in the 1976 Constitution did not yet include what we commonly refer to as the Equal Protection Clause of the 1983 Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Par. II ("Protection to person and property is the paramount duty of government and shall be impartial and complete. *No person shall be denied the equal protection of the laws.*" (emphasis added)).

[8] Ga. Const. of 1976, Art. III, Sec. VIII, Par. VIII ("All contracts and agreements, which may have the effect, or be intended to have the effect, to defeat or lessen competition, or to encourage monopoly, shall be illegal and void. The General Assembly of this State shall have no power to authorize any such contract or agreement. The General Assembly shall enforce the provisions of this Paragraph by appropriate legislation.").

regulating motor vehicle franchise practices" as unconstitutional, the people of Georgia ratified a constitutional amendment that "expressly authorize[d] the General Assembly to regulate new motor vehicle manufacturers, distributors, dealers, and their representatives doing business in Georgia" notwithstanding certain "constitutional provisions that litigants had relied on to challenge previous motor vehicle franchise laws." *WMW, Inc. v. Am. Honda Motor Co.*, 291 Ga. 683, 686 & n.3 (2012) (cleaned up). See Ga. L. 1992, p. 3342, § 1, ratified Nov. 3, 1992. As relevant here, the 1992 constitutional amendment — which is now codified as Paragraph II(c) of Georgia's Constitution — provides:

> The distribution of … new motor vehicles … in the State of Georgia vitally affects the general economy of the state and the public interest and public welfare. Notwithstanding the provisions of Article I, Section I, Paragraphs I [the Due Process Clause], II [the Equal Protection Clause], and III [the Freedom of Conscience Clause[9]] or Article III, Section VI, Paragraph V(c) [the

---

[9] Ga. Const. of 1983, Art. I, Sec. I, Par. III ("Each person has the natural and inalienable right to worship God, each according to the dictates of that person's own conscience; and no human authority should, in any case, control or interfere with such right of conscience.").

Anti-Competitive Contracts Clause[10]] of this Constitution, the General Assembly in the exercise of its police power shall be authorized to regulate … new motor vehicle manufacturers, distributors, dealers, and their representatives doing business in Georgia, including agreements among such parties, in order to prevent frauds, unfair business practices, unfair methods of competition, impositions, and other abuses upon its citizens.

Ga. Const. of 1983, Art. III, Sec. VI, Par. II(c). Following ratification of Paragraph II(c), "the General Assembly invoked its new constitutional authority when it substantively reenacted the Franchise Practices Act." *WMW*, 291 Ga. at 686 (cleaned up). See Ga. L. 1993, p. 1586, § 1 ("It is the intent of the General Assembly to substantively reenact certain legislation relating to distribution of tractors, farm equipment, heavy equipment, and motor vehicles subsequent to the ratification at the 1992 general election of a

---

[10] Ga. Const. of 1983, Art. III, Sec. VI, Par. V(c)(1) ("The General Assembly shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of encouraging a monopoly, which is hereby declared to be unlawful and void. Except as otherwise provided in subparagraph (c)(2) of this Paragraph, the General Assembly shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition, which is hereby declared to be unlawful and void.").

9

constitutional amendment declaring that such distribution vitally affects the general economy of the state and the public interest and public welfare and authorizing the General Assembly to regulate such distribution.").

This case concerns several provisions of the Motor Vehicle Fair Practices Act, OCGA § 10-1-660 et seq., a subdivision of the Georgia Motor Vehicle Franchise Practices Act, OCGA § 10-1-620 et seq. By way of background, Georgia law prohibits anyone from operating as a new motor vehicle dealer in the state without first obtaining a dealer license from the Georgia Department of Revenue. See OCGA § 40-2-39(b)(1) ("It shall be unlawful for any person to engage in any activity as a new motor vehicle dealer unless and until such person has registered with the commissioner and obtained a dealer's number license plate ...."); OCGA § 40-2-1(2) ("'Commissioner' means the state revenue commissioner."). And the Motor Vehicle Fair Practices Act restricts who may obtain a dealer license by

restricting who may own or operate a "dealer"[11] or "dealership"[12] in the state.

As relevant here, OCGA § 10-1-664.1(a) — the first component of the Direct Sales Prohibition — generally prohibits manufacturers and affiliated entities from owning or operating a dealer or dealership, providing that, subject to certain exceptions, "[i]t shall be unlawful for any manufacturer … or any parent, affiliate, wholly or partially owned subsidiary, officer, or representative of a manufacturer … to own, operate, or control, directly or indirectly, more than a 45 percent interest in a dealer or dealership in this state."

As noted above, the other component of the Direct Sales Prohibition is OCGA § 10-1-664.1(c), which provides that, as a general matter, "no manufacturer or franchisor shall offer to sell or

---

[11] See OCGA § 10-1-622(1) ("'Dealer' means any person engaged in the business of selling, offering to sell, soliciting, or advertising the sale of new motor vehicles and who is licensed or otherwise authorized to utilize trademarks or service marks associated with one or more makes of motor vehicles in connection with such sales.").

[12] See OCGA § 10-1-622(2)(A) (defining "[d]ealership" as including "[t]he dealer, if the dealer is a corporation, partnership, or other business organization.").

11

sell, directly or indirectly, any new motor vehicle to a consumer in this state, except through a new motor vehicle dealer holding a franchise for the line make covering such new motor vehicle." By its plain terms, this provision only regulates the sale to consumers of "new motor vehicle[s]." OCGA § 10-1-664.1(c). And, as explained below, because the statutory definition of that term has changed over the years, so too has the effect of OCGA § 10-1-664.1(c).

Prior to a 2015 amendment, the Motor Vehicle Franchise Practices Act defined "[n]ew motor vehicle" as "a motor vehicle which has been sold to a dealer and on which the original motor vehicle title has not been issued." OCGA § 10-1-622(11) (2010). But in 2015, the General Assembly amended this definition, removing the phrase "which has been sold to a dealer," and defining "[n]ew motor vehicle" simply as "a motor vehicle on which the original motor vehicle title has not been issued." OCGA § 10-1-622(11). See Ga. L. 2015, Act 159, § 1.

The change to the statutory definition of "new motor vehicle" had a significant impact on the operation of OCGA § 10-1-664.1(c).

12

Prior to the 2015 amendment, when "new motor vehicle" was defined as including only new vehicles that had *been sold to a dealer*, the plain language of OCGA § 10-1-664.1(c) did not require manufacturers to sell new motor vehicles through independent franchised dealers. It only prohibited a manufacturer from selling a new motor vehicle to consumers through a non-franchised dealer, providing that a manufacturer could not "offer to sell or sell, directly or indirectly, any new motor vehicle [i.e., any motor vehicle *which has been sold to a dealer* and on which the original motor vehicle title has not been issued] to a consumer in this state, except through a new motor vehicle dealer holding a franchise for the line make covering such new motor vehicle." OCGA § 10-1-664.1(c). After the 2015 amendment redefined "new motor vehicle" more broadly as any motor vehicle without an issued title, however, the plain language of OCGA § 10-1-664.1(c) applied differently, prohibiting manufacturers from selling new motor vehicles directly to consumers and requiring that manufacturers instead sell new motor vehicles through independent franchised dealers. Specifically,

13

OCGA § 10-1-664.1(c) now provides that manufacturers cannot "offer to sell or sell, directly or indirectly, any new motor vehicle [i.e., a motor vehicle on which the original motor vehicle title has not been issued] to a consumer in this state, except through a new motor vehicle dealer holding a franchise for the line make covering such new motor vehicle."

As alleged in the amended complaint, prior to the 2015 amendment, Tesla Motors, Inc. ("Tesla") — a manufacturer of new electric motor vehicles that (like Lucid and its manufacturing affiliate) sells its electric vehicles in other states directly to consumers without using independent franchised dealers as intermediaries — obtained a dealer license to sell new motor vehicles directly to customers in Georgia. As further alleged in the amended complaint, once the General Assembly redefined "new motor vehicle" in 2015, OCGA § 10-1-664.1(c) would have prohibited Tesla from selling new vehicles in the state directly to customers without utilizing a franchised dealer as an intermediary. But the same amendment that redefined "new motor vehicle" also added a

14

new provision to OCGA § 10-1-664.1 that created an exception to the Direct Sales Prohibition for a limited class of electric motor vehicle manufacturers who were operating dealerships in the state as of January 1, 2015 — a class that (as appears undisputed on appeal) includes, and could only ever include, Tesla. Specifically, the 2015 amendment added a new subsection — OCGA § 10-1-664.1(a)(8) — which provides that OCGA § 10-1-664.1(a) "shall not be construed to prohibit":

> The ownership, operation, or control by a manufacturer of not more than five locations licensed as new motor vehicle dealerships for the sale of new motor vehicles and any number of locations that engage exclusively in the repair of such manufacturer's line make of motor vehicles, provided that such manufacturer was selling or otherwise distributing its motor vehicles at an established place of business in this state as of January 1, 2015, and:
>
> > (A) The manufacturer manufactures or assembles zero emissions motor vehicles exclusively and has never sold its line make of motor vehicles in this state through a franchised new motor vehicle dealer; and
> >
> > (B) The manufacturer has not acquired a controlling interest in a franchisor or a subsidiary or other entity controlled by such franchisor, or sold or transferred a controlling interest in such

15

> manufacturer to a franchisor or subsidiary or other entity controlled by such franchisor.

OCGA § 10-1-664.1(a)(8); Ga. L. 2015, Act 159, § 2.

2. As noted above, Lucid sued the State, challenging the Direct Sales Prohibition under the Due Process Clause, the Equal Protection Clause, and Paragraph IV of Georgia's Constitution (which places certain limitations on the passage of general and special laws). As to the Paragraph IV claim, Lucid alleged that the Direct Sales Prohibition "arbitrarily distinguishes between classes that are similarly situated in all material respects," and that it therefore violates Paragraph IV(a), "because it is not a law of a general nature that has a uniform operation throughout this state." And Lucid alleged that the Direct Sales Prohibition violates Paragraph IV(c) "because it is a special law relating to the rights or status of private persons."

Over Lucid's objection, the trial court permitted the Georgia Automobile Dealers Association ("GADA") to intervene as a defendant. And the State and GADA each moved to dismiss the

complaint. The defendants argued that Lucid's due process and equal protection claims were barred by Paragraph II(c), which authorizes the General Assembly to regulate the new motor vehicle industry notwithstanding the Due Process and Equal Protection Clauses. GADA argued that the same constitutional provision also preempted Lucid's claim under Paragraph IV. And the defendants argued that Lucid's Paragraph IV claim failed because the challenged laws operated uniformly upon all people within their ambit.

Following a hearing, the trial court issued an order granting the defendants' motions to dismiss. First, the trial court concluded that the "plain, unambiguous language of Paragraph II(c) mandate[d] the dismissal" of Lucid's due process and equal protection claims because the Direct Sales Prohibition was enacted pursuant to Paragraph II(c), and because Paragraph II(c) grants the General Assembly the authority to regulate new motor vehicle manufacturers "notwithstanding" the Due Process and Equal Protection Clauses. In reaching this conclusion, the court rejected

17

Lucid's argument that the language in Paragraph II(c) stating that the General Assembly could issue such regulations "in order to prevent frauds, unfair business practices, unfair methods of competition, impositions, and other abuses upon [Georgia's] citizens" limited the General Assembly's authority to regulate new motor vehicle manufacturers pursuant to Paragraph II(c). According to the trial court, this language was merely an inoperative "statement of purpose," not a "limitation," because the framers would have used "more precise language" if they had meant for the language "to function as a limitation"; reading the language "as a limitation is not a natural reading of the text"; and reading the language as a limitation "would force the courts to evaluate the exercise of the General Assembly's police power," which is "precisely *not* the role of the courts … where the General Assembly can regulate without regard to the Equal Protection Clause or Due Process Clause."

Second, the trial court concluded that Lucid could not show that the Direct Sales Prohibition violated Paragraph IV because

18

Paragraph IV only requires that a general law operate alike with respect to all who come within its scope, "it is beyond dispute that the Direct Sales Prohibition" is a "general law," and "the Direct Sales Prohibition applies with equal force to all who fall within its terms throughout the State." The trial court concluded that it was irrelevant that the Direct Sales Prohibition provided for exceptions because general laws can have exceptions. The trial court also rejected Lucid's argument that the exception tailored to Tesla was an unconstitutional special law, noting that even a law that applies in only one instance can be a general law. And the court noted that a challenge to the exception to the Direct Sales Prohibition that applied only to Tesla could not redress Lucid's grievance because, if the court concluded that the exception was unconstitutional, "the proper remedy would be to declare it [unconstitutional] and enjoin [its] enforcement," not to declare "the remainder of the statute" prohibiting direct sales unconstitutional.

3. In its first of two enumerations of error on appeal, Lucid argues that the trial court misinterpreted Paragraph II(c), and, as a

19

result, applied an incorrect standard in concluding that Paragraph II(c) barred Lucid's due process and equal protection claims. We agree.

When interpreting the Constitution, we generally "afford the constitutional text its plain and ordinary meaning, view the text in the context in which it appears, and read the text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Hollis v. City of LaGrange*, 320 Ga. 451, 453–54 (2024) (quotation marks omitted). Accordingly, our construction of Paragraph II(c) begins with the text itself, which, as noted above, states in relevant part:

> The distribution of … new motor vehicles … in the State of Georgia vitally affects the general economy of the state and the public interest and public welfare. Notwithstanding the provisions of Article I, Section I, Paragraphs I [the Due Process Clause], II [the Equal Protection Clause], and III [the Freedom of Conscience Clause] or Article III, Section VI, Paragraph V(c) [the Anti-Competitive Contracts Clause] of this Constitution, the General Assembly in the exercise of its police power shall be authorized to regulate … new motor vehicle manufacturers, distributors, dealers, and their representatives doing business in Georgia, including agreements among such parties, in order to prevent

> frauds, unfair business practices, unfair methods of competition, impositions, and other abuses upon its citizens.

Ga. Const. of 1983, Art. III, Sec. VI, Par. II(c).

The plain language of Paragraph II(c) establishes that, pursuant to its "police power," the General Assembly may pass certain statutes that "regulate … new motor vehicle manufacturers, distributors, dealers, and their representatives doing business in Georgia," and that it may pass such statutes "[n]otwithstanding" — that is, *despite* — any limitation that the enumerated constitutional provisions, such as the Due Process Clause and the Equal Protection Clause, might otherwise impose on the General Assembly's police power. See *Notwithstanding*, Merriam Webster's Collegiate Dictionary 795 (10th ed. 1997) (defining "notwithstanding" as meaning "despite"); *Notwithstanding*, Webster's Ninth New Collegiate Dictionary 808 (1988) (same). Because Paragraph II(c) authorizes certain regulations despite any limitations imposed by the enumerated constitutional provisions, the trial court correctly determined that claims based on the enumerated constitutional

21

provisions that challenge regulations authorized by Paragraph II(c) are barred by the Constitution. That much is undisputed on appeal.[13]

The dispute here concerns *which* regulations Paragraph II(c) authorizes. The trial court concluded that Paragraph II(c) authorizes *any* regulation of "new motor vehicle manufacturers, distributors, dealers, and their representatives doing business in Georgia." In reaching this conclusion, however, the trial court disregarded Paragraph II(c)'s "in order to" clause, which states that the General Assembly is authorized to regulate the new motor vehicle industry "in order to prevent frauds, unfair business

---

[13] While unclear, GADA appears to claim that Paragraph II(c) bars not only claims arising under the constitutional provisions it expressly enumerates but also claims arising under other constitutional provisions if the claims resemble claims arising under the enumerated constitutional provisions. Specifically, GADA argues that, because Lucid's Paragraph IV claim resembles an equal protection claim, and because Paragraph II(c) enumerates the Equal Protection Clause, Paragraph II(c) bars Lucid's Paragraph IV claim. This argument, however, is misguided. It is a well-established canon of construction that "[t]he express mention of one thing implies the exclusion of another." *Allen v. Wright*, 282 Ga. 9, 13–14 (2007) (quotation marks omitted). And Paragraph II(c) expressly enumerates several constitutional provisions, while excluding Paragraph IV from the list. Accordingly, even assuming the legislation at issue here is the type of regulation authorized by Paragraph II(c), Paragraph II(c) would not bar a Paragraph IV-based challenge to that legislation.

practices, unfair methods of competition, impositions, and other abuses upon [Georgia's] citizens." As explained below, the trial court erred in disregarding this language.

A constitutional provision "should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part." *Camden County v. Sweatt*, 315 Ga. 498, 509 (2023) (quotation marks omitted). And because it is presumed that no part of the text is "without meaning," a court "generally should avoid a construction that makes some language mere surplusage." Id. (quotation marks omitted).

Here, the trial court relied on the converse of these well-established canons of construction in concluding that Paragraph II(c)'s "in order to" clause was not a limitation on the General Assembly's authority under Paragraph II(c). The trial court was correct insofar as it concluded that, when Paragraph II(c) was ratified, the phrase "in order to" was generally understood to mean "for the purpose of." *Order,* Merriam Webster's Collegiate Dictionary 818 (10th ed. 1997) (defining "in order to" as "for the purpose of");

*Order*, Webster's Ninth New Collegiate Dictionary 830 (1988) (same). But rather than presuming that the "in order to" clause had operative effect and reading the provision in the most natural way based on that presumption, the trial court presumed that the clause was mere surplusage and concluded that, absent "more precise language," that presumption could not be rebutted. This reasoning was erroneous.

Properly applying the surplusage canon, Paragraph II(c)'s "in order to" clause is naturally read as a limitation on the police power authorized by the provision. Presuming that the "in order to" clause has meaning and effect, as we should, the plain language of Paragraph II(c) authorizes the General Assembly to exercise its "police power" to pass regulations on the "new motor vehicle" industry that are *for the purpose of* "prevent[ing] frauds, unfair business practices, unfair methods of competition, impositions, and other abuses upon [Georgia's] citizens." And so long as a regulation of the "new motor vehicle" industry is for the purpose of preventing the types of "abuses upon [Georgia's] citizens" specified in the

24

provision, Paragraph II(c) renders the regulation immune from challenge under the constitutional provisions enumerated in Paragraph II(c).[14]

This textual interpretation of Paragraph II(c) is also supported by the legal and historical context in which the provision was ratified. As explained above, Paragraph II(c) was ratified in response to our decisions striking down portions of the prior Franchise Practices Act. In those decisions, we had indicated that "the power of the state to regulate private business" is "limited," *Gen. GMC Trucks*, 239 Ga. at 376, and that it was improper for the

---

[14] In concluding that the "in order to" clause was not a limitation on the General Assembly's authority under Paragraph II(c), the trial court also reasoned that, because Paragraph II(c) exempts regulations of the new motor vehicle industry from scrutiny under the enumerated constitutional provisions, and because reading the "in order to" clause as a limitation "would force the courts to evaluate the exercise of the General Assembly's police power," it would not make sense to read "in order to" clause as a limitation on the General Assembly's authority. This reasoning, however, confuses the nature of the limitation imposed by Paragraph II(c)'s "in order to" clause. That clause is not a limitation on the General Assembly's police power, but it limits the ways the police power may be exercised that are immune from challenge under the enumerated constitutional provisions. Paragraph II(c) requires an assessment of whether the regulation in question fits within the category of regulations immune from such challenges. That said, a determination that a given regulation is not within that category does not mean that it is invalid, only that it is not immune from challenges under the enumerated constitutional provisions.

General Assembly to seek "to regulate [the new motor vehicle] industry," which is "not affected with a public interest," *Massey-Ferguson, Inc.*, 244 Ga. at 802. We had struck down a prior version of the Franchise Practices Act as violative of several provisions of the Georgia Constitution, including provisions that addressed due process, equal protection, and anti-competitive contracts. See *Massey-Ferguson*, 244 Ga. at 801–03. And we had noted the well-established principle that the police power permits the General Assembly to pass regulations "where the health, safety and welfare of its citizens are at stake," including where "fraud" in "the purchase and sale of motor vehicles" puts the "general welfare of the public" at stake. *Gen. GMC Trucks*, 239 Ga. at 376, 379.

The text of Paragraph II(c) addresses each of these points. First, contrary to our decisions indicating that the new motor vehicle industry was not affected with the public interest and could not be regulated, Paragraph II(c) clarifies that the "new motor vehicle" industry "vitally affects the general economy of the state and the public interest and public welfare," and that the "police power"

26

authorizes the General Assembly to "regulate" the "new motor vehicle" industry. Second, in response to our decisions striking down the Franchise Practices Act under specific provisions of Georgia's Constitution (including the Due Process Clause, the Equal Protection Clause, and the Anti-Competitive Contracts Clause), Paragraph II(c) specifies that the General Assembly may pass certain regulations of the new motor vehicle industry "[n]otwithstanding" those constitutional provisions. Finally, Paragraph II(c) clarifies that the scope of the police power authorized in the provision is consistent with the traditional police power (which authorizes legislation designed to protect the health, safety, and welfare of Georgia citizens) in that the General Assembly can pass regulations of the new motor vehicle industry that are for the purpose of "prevent[ing] … abuses upon [Georgia's] citizens," such as "frauds, unfair business practices, unfair methods of competition, [and] impositions."

Because the trial court dismissed Lucid's due process and equal protection claims under Paragraph II(c) without first considering

whether the Direct Sales Prohibition was enacted for the purpose of preventing the types of abuses specified in Paragraph II(c), the court's dismissal was premature.[15] We therefore vacate the trial court's dismissal of Lucid's due process and equal protection claims and remand for further consideration of those claims consistent with this opinion.

4. In its second and final enumeration of error on appeal, Lucid challenges the trial court's dismissal of its claims challenging the Direct Sales Prohibition under Paragraph IV(a) and (c), which, as relevant here, provide:

> (a) Laws of a general nature shall have uniform operation throughout this state and no local or special law shall be enacted in any case for which provision has been made by an existing general law ….

> (c) No special law relating to the rights or status of private persons shall be enacted.

Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(a), (c).[16] As explained

---

[15] On remand, the trial court should consider in the first instance which party has the burden to establish the challenged legislation's purpose and what showing is required to establish that purpose under Paragraph II(c).

[16] Although Paragraph IV(c) was included for the first time in Georgia's

below, we affirm in part and vacate in part the trial court's dismissal of Lucid's Paragraph IV claims.

(a) At the outset, we note that the portions of Paragraph IV(a) and (c) quoted above contain a total of three separate provisions that are relevant here, each of which concerns "general" or "special" laws, and each of which requires a different analysis.

As a general matter, whether a law is a "general law" or a "special law" under Paragraph IV turns on the legislative

---

1983 Constitution, the portion of Paragraph IV(a) relevant here has been included in Georgia's Constitution in materially similar form since the Georgia Constitution of 1877. Compare Ga. Const. of 1877, Art. I, Sec. IV, Par. I ("Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by existing general law. No general law affecting private rights shall be varied in any particular case by special legislation, except with the free consent, in writing of all persons to be affected thereby; and no person under legal disability to contract is capable of such consent."), Ga. Const. of 1945, Art. I., Sec. IV ("Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law. No general law affecting private rights, shall be varied in any particular case, by special legislation, except with the free consent, in writing, of all persons to be affected thereby; and no person under legal disability to contract, is capable of such consent."), and Ga. Const. of 1976, Art. I, Sec. II, Par. VII (same), with Ga. Const. of 1868, Art. I, Sec. 26 ("Laws shall have a general operation, and no general law, affecting private rights, shall be varied, in any particular case, by special legislation, except with the free consent, in writing, of all persons to be affected thereby; and no person under legal disability to contract is capable of such free consent.").

29

classification drawn by the law. A "special law" is a law that draws a "legislative classification" that is "arbitrary or unreasonable" in relation to the "purpose" of the legislation, *Dev. Auth. of DeKalb County v. State*, 286 Ga. 36, 39–40 (2009) (quotation marks omitted). See *Walker v. Cromartie*, 287 Ga. 511, 513 (2010) (noting that "[a] special law is a law that only affects a limited area or class" and thus does not "appl[y] uniformly to the subject with which it purports to deal"); *Gliemmo v. Cousineau*, 287 Ga. 7, 8 (2010) ("This Court has found a statute to be a special law where it deals with a limited activity in a specific industry during a limited time frame." (quotation marks omitted)); *Lasseter v. Georgia Pub. Serv. Comm'n*, 253 Ga. 227, 229 (1984) (noting that "special laws affect[ ] special classes"); *Sasser v. Martin*, 101 Ga. 447, 453–54 (1897) (explaining that not all "public law[s]" are "general law[s]," and that "[a] public statute is special, not only when it is local, but also when it is confined in its subject to less than a class of persons or things"). By contrast, a "general law" is a law that is "framed in general terms" and applies to a "[non]arbitrary" class of "objects" that "are

distinguished by characteristics sufficiently marked and important to make them a class by themselves" with respect to the legislation's "subject-matter" and "purpose." *Sasser*, 101 Ga. at 455–57 (quotation marks omitted) (noting that a general law draws "a substantial distinction, having reference to the subject-matter of the proposed legislation, between the objects or places embraced in such legislation and the objects or places excluded"). In other words, a law is "general" if "the classes included or excluded from its general effect are reasonable and not arbitrary" with respect to the subject matter of the legislation. *McAllister v. Am. Nat. Red Cross*, 240 Ga. 246, 248–49 (1977). See *Zarate-Martinez v. Echemendia*, 299 Ga. 301, 311 (2016) (noting that a "general law" makes "classification[s]" that are "not arbitrary or unreasonable" (cleaned up)).[17]

The first provision of Paragraph IV that is relevant here

---

[17] See also Walter McElreath, A Treatise on the Constitution of Georgia § 123 ("One of the most important limitations placed upon legislative action was the provision that 'no special law should be enacted in any case where provision had been made by general law.' This has given prominence to the theory of the classification of subjects [sic] matter of legislation and the enactment of what are known as 'General laws of local application,' based upon a classification, in many cases, so nearly arbitrary that it amounts to little more than a subterfuge.").

appears in subsection (a). It provides that "[l]aws of a general nature shall have uniform operation throughout this state." Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(a). "[T]o violate this constitutional provision, the statute in question must … be [1] a general law which [2] lacks uniform operation throughout the state." *Gliemmo*, 287 Ga. at 8 (cleaned up). As to the uniformity component of Paragraph IV(a), we have explained that a general law has uniform operation for purposes of Paragraph IV(a) so long as it "operates alike on all who come within the scope of its provisions," meaning that it "appl[ies] to all persons, matters, or things which it is intended to affect." *Zarate-Martinez*, 299 Ga. at 311 (quotation marks omitted). See *Sasser*, 101 Ga. at 452 (explaining that a general law satisfies the uniformity requirement if it is "uniform in its operation or capable of being made uniform in its operation upon the subject or class of subjects with which it purported to deal"). See also Walter McElreath, A Treatise on the Constitution of Georgia § 1136 (1912) (noting that the "*[t]erritorial test* of whether a law is general law is that it shall operate in every part of the State upon every person or

32

transaction embraced within its terms"). "When a [general law] purports to do this, but in application lacks uniform operation, it runs afoul of [Paragraph IV(a)]." *Lasseter*, 253 Ga. at 229.

The second provision of Paragraph IV relevant here also appears in subsection (a). Specifically, Paragraph IV(a) provides that "no local or special law shall be enacted in any case for which provision has been made by an existing general law." Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(a). We have explained that this provision "was intended to ensure that once the legislature entered a field by enacting a general law, that field must thereafter be reserved exclusively to general legislation and could not be open to special or local laws." *City of Atlanta v. Mays*, 301 Ga. 367, 376 (2017) (punctuation and quotation marks omitted). See also *Gliemmo*, 287 Ga. at 8 ("[T]o violate [this provision of Paragraph IV(a)], the statute in question must … [be] a special law for which provision has been made by existing general law." (quotation marks omitted)).

The third provision of Paragraph IV relevant here is Paragraph

IV(c), which provides that "[n]o special law relating to the rights or status of private persons shall be enacted." Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(c). And our precedent clarifies that the term "special law" carries the same meaning in Paragraph IV(c) as it does in Paragraph IV(a). See *Gliemmo*, 287 Ga. at 10 (concluding that a statute did not violate Paragraph IV(c) because it was a general law for purposes of Paragraph IV(a)); *State v. Martin*, 266 Ga. 244, 246 (1996) (same).

This description of Paragraph IV makes clear that Paragraph IV "does not prohibit special laws per se." *Lasseter*, 253 Ga. at 229 (addressing Paragraph IV's predecessor in Georgia's 1976 Constitution). The first provision of Paragraph IV(a) has no bearing on special laws, requiring only that "general law[s]" have "uniform operation throughout the state." *Zarate-Martinez*, 299 Ga. at 310–11 (quotation marks omitted). The second provision of Paragraph IV(a) prohibits only "special law[s] for which provision ha[s] been made by existing general law." Id. (quotation marks omitted). And Paragraph IV(c) prohibits only "special law[s]" that "relat[e] to the

34

rights or status of private persons." Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(c).

(b) Here, the trial court did not fully analyze Lucid's Paragraph IV claim under any of these three provisions. The trial court performed only a partial analysis under the first provision of Paragraph IV(a), which requires that laws of a general nature apply uniformly throughout the state. Specifically, the trial court analyzed whether the Direct Sales Prohibition applied uniformly, concluding that it "applies with equal force to all who fall within its terms throughout the State." But the trial court did not analyze whether the Direct Sales Prohibition was a general or special law, asserting without any explanation or analysis that it was "beyond dispute" that the Direct Sales Prohibition was a "general law."

While the trial court's focus on Paragraph IV(a) is understandable, given Lucid's characterization of its own claims, that focus may have been misguided. Lucid purports to claim that the Direct Sales Prohibition violates Paragraph IV(a) "because [the Direct Sales Prohibition] is not a law of a general nature that has a

35

uniform operation throughout this state." But it is clear from Lucid's complaint and its arguments on appeal that Lucid's primary challenge to the Direct Sales Prohibition does not actually arise under this provision. This is because Lucid's theory of why the Direct Sales Prohibition violates this provision is that the law "creates … arbitrary classifications" — a theory that, if successful, would show only that the Direct Sales Prohibition is a special law. And as explained above, the first provision of Paragraph IV(a) does not address special laws: it places limitations only on general laws.

Attempting to fit its challenge to the Direct Sales Prohibition within the scope of the first provision of Paragraph IV(a), Lucid argues that a law that draws unreasonable classifications necessarily violates Paragraph IV(a)'s prohibition on general laws that lack uniform application. To support this argument, Lucid cites our decisions in *Lasseter*, 253 Ga. at 227, *Celotex Corporation v. St. Joseph Hospital*, 259 Ga. 108 (1989), and *Hix v. Ramey*, 214 Ga. 464 (1958). But as our description of the law set out above shows, Lucid's interpretation of Paragraph IV(a) is incorrect. And none of the cases

36

cited by Lucid support that interpretation.

First, in *Lasseter*, which addressed Paragraph IV's predecessor in the 1976 Constitution,[18] we concluded that, because the challenged law "deal[t] with a limited activity in a specific industry during a limited time frame," it was a "special law." *Lasseter*, 253 Ga. at 229. But we did not hold that the "special class[ification]" drawn by the statute rendered it unconstitutional under Paragraph IV's predecessor. Id. Instead, we noted that Paragraph IV's predecessor "d[id] not prohibit special laws per se" and concluded that the special law did not violate Paragraph IV because it was not "preempted" by a general law. Id. at 229–30. Further, although *Lasseter* acknowledged that the General Assembly lacks authority to pass a law "if the classification of those affected is unreasonable," we explained that the Equal Protection Clause, not Paragraph IV's predecessor, prohibited such legislation. Id.

---

[18] Ga. Const. of 1976, Art. I, Sec. II, Par. VII (providing, as relevant here, that "[l]aws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law").

37

Second, in *Celotex*, we explained that the law at issue was a "special law" because it unreasonably "single[d] out for special treatment property claims against manufacturers and suppliers of asbestos." *Celotex*, 259 Ga. at 110. But we did not hold that the law violated Paragraph IV(a) simply because it was a special law that drew an unreasonable classification. Instead, we held that the special law violated Paragraph IV(a) because the special law was "preempt[ed]" by a general law applicable to "*all* other claims that might be based upon other hazardous or toxic substances." Id. (quotation marks omitted).

Third, our decision in *Hix* did not hold, as Lucid argues, that legislation affording special treatment to school bus drivers who had contracts during certain years violated Paragraph IV's predecessor because the law rested on a "purely arbitrary" classification. *Hix*, 214 Ga. at 466. It is true that *Hix* concluded that the law was a "special law" because it employed an arbitrary classification. Id. But the reason *Hix* concluded that the law was unconstitutional was not because it drew an arbitrary classification but instead because it

38

conflicted with a general law regarding school bus drivers. See id. at 464–66 (holding that the challenged law was a special law "limited by its express terms to the bus drivers who had 1951–52 contracts," and that the law was "invalid for the reasons urged," namely that the law was "a special law made in derogation of existing general law" providing that the "salary schedule shall be uniform for all bus drivers transporting twelve or more school children").

Even if Lucid's amended complaint could be construed as claiming that the Direct Sales Prohibition violates Paragraph IV(a)'s prohibition on general laws that lack uniformity, the claim fails because, as a matter of law, the Direct Sales Prohibition is a general law with uniform operation throughout the state.[19] First, the Direct Sales Prohibition is a general law because the classifications it draws are reasonable and relevant to the purpose of the legislation

---

[19] As noted above, the portions of OCGA § 10-1-664.1(a) and (c) that constitute the Direct Sales Prohibition and that Lucid challenges in this case generally prohibit manufacturers and franchisors from selling new motor vehicles directly to consumers in the state and prohibit manufacturers and franchisors from owning, operating, or controlling a dealer or dealership. We express no opinion about other portions of OCGA § 10-1-664.1(a) and (c).

at issue. Specifically, the classifications that are the subject of OCGA § 10-1-664.1(a) and (c) are "manufacturer[s]" and "franchisor[s]."[20] The Direct Sales Prohibition therefore applies to broad categories of entities that "are distinguished by characteristics sufficiently marked and important to make them a class by themselves," *Sasser*, 101 Ga. at 456–57 (quotation marks omitted), in that manufacturers and franchisors are readily identifiable entities that play important roles in Georgia's new motor vehicle industry. And it is not arbitrary or unreasonable to identify broad classes of important players in Georgia's new motor vehicle industry as the subject of legislation concerning who may own a new motor vehicle dealer or dealership and who may sell new motor vehicles in the state to customers. Thus, the Direct Sales Prohibition is a "general" law, not a "special" one.

Second, as the trial court correctly concluded, the Direct Sales

---

[20] OCGA § 10-1-664.1(a) also includes a catchall phrase that applies to certain entities or persons affiliated with a manufacturer or franchisor. See OCGA § 10-1-664.1(a) (providing that it applies to "any manufacturer or franchisor or *any parent, affiliate, wholly or partially owned subsidiary, officer, or representative of a manufacturer or franchisor*" (emphasis added)).

Prohibition operates uniformly for purposes of Paragraph IV(a) because it "operates alike on all who come within the scope of its provisions." *Zarate-Martinez*, 299 Ga. at 311 (quotation marks omitted). The plain language of the Direct Sales Prohibition applies to any "manufacturer or franchisor" in the state. Specifically, the challenged portion of OCGA § 10-1-664.1(a) applies equally to "any manufacturer or franchisor" in the state, prohibiting such entities from "own[ing], operat[ing], or control[ling] … more than a 45 percent interest in a dealer or dealership in this state." And the challenged portion of OCGA § 10-1-664.1(c) likewise applies equally to any "manufacturer" or "franchisor" in the state, prohibiting such entities from "sell[ing] … any new motor vehicle to a consumer in this state, except through a new motor vehicle dealer holding a franchise for the line make covering such new motor vehicle." And Lucid does not claim that, although the plain language of these provisions "purport[ ] to" apply uniformly to all manufacturers and franchisors, they fail to apply to all manufacturers or franchisors "in application." *Lasseter*, 253 Ga. at 229.

41

Because the Direct Sales Prohibition is a general law with uniform operation, Lucid's claim that the Direct Sales Prohibition violates Paragraph IV(a)'s requirement that "[l]aws of a general nature … have uniform operation throughout this state" fails as a matter of law. Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(a). Further, because the Direct Sales Prohibition is a general law, rather than a special law, Lucid's claim that the Direct Sales prohibition violates Paragraph IV(c)'s prohibition on enacting any "*special law* relating to the rights or status of private persons" likewise fails as a matter of law.[21] Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(c) (emphasis added). See *Gliemmo*, 287 Ga. at 10 (holding that, because the challenged law was "a general law, it does not violate [Paragraph IV(c)], which prohibits *special* laws relating to the rights or status of private persons" (quotation marks omitted)).

---

[21] To the extent that Lucid claims that the Direct Sales Prohibition violates Paragraph IV(a)'s prohibition on enacting any "*special law* … in any case for which provision has been made by an existing general law," that claim fails as a matter of law for the same reason: the Direct Sales Prohibition is a general law, not a special law. Ga. Const. of 1983, Art. III, Sec. VI, Par. IV(a) (emphasis added).

(c) Lucid argues that it has stated a claim under Paragraph IV based on OCGA § 10-1-664.1(a)(8), which, as described above, permits a limited class of electric vehicle manufacturers who were operating dealerships in the state as of January 1, 2015, to sell their vehicles directly to consumers in Georgia without using a franchised dealer as an intermediary. Lucid contends that OCGA § 10-1-664.1(a)(8) can only ever apply to Tesla and is therefore a special law that "arbitrarily distinguishes between manufacturers and their affiliates (like Lucid) that cannot sell cars in Georgia and manufacturers and their affiliates (like Tesla) that can." And Lucid also contends that the 2015 amendment (Ga. L. 2015, Act 159), which simultaneously created the Direct Sales Prohibition and the exception for Tesla, was invalid "special legislation." As explained below, the trial court correctly dismissed Lucid's challenge to OCGA § 10-1-664.1(a)(8) but failed to adequately consider whether Lucid had stated a Paragraph IV claim challenging the 2015 amendment.

To the extent that Lucid claims that OCGA § 10-1-664.1(a)(8) is a special law that violates Paragraph IV, Lucid lacks

43

constitutional standing to raise the claim. "Standing is a jurisdictional prerequisite necessary to invoke a court's judicial power under the Georgia Constitution." *Cobb County v. Floam*, 319 Ga. 89, 91 (2024) (citing Ga. Const. of 1983, Art. VI, Sec. I, Par. I). As the party seeking to invoke a court's jurisdiction, the plaintiff bears the burden of establishing its constitutional standing as to each claim of relief sought. See *Republican National Committee v. Eternal Vigilance Action, Inc.*, 321 Ga. 771, 775 (2025). To do so, the plaintiff must show that it has "a cognizable injury that can be redressed by a judicial decision." *Sons of Confederate Veterans v. Henry Cnty. Bd. of Comm'rs*, 315 Ga. 39, 39 (2022). And a plaintiff has a "cognizable injury" at stake in the litigation only if the plaintiff "assert[s] a violation of [the plaintiff's] legal rights — a legal injury." *Wasserman v. Franklin County*, 320 Ga. 624, 624, 638–39 & n.8 (2025) (quotation marks omitted) ("[W]ithout a right at stake, there is no actual controversy between the parties for a court to resolve."). Finally, in the context of a constitutional challenge to a state statute, like the one at issue here, "it is generally not sufficient to assert only

the generalized violation of a *public* right, which is by definition not individualized, at least absent a right of action granted by the legislature for vindicating the public right at issue." Id. at 643 n.10.

Here, Lucid has not asserted that enforcement of OCGA § 10-1-664.1(a)(8) in particular (as opposed to the Direct Sales Prohibition) causes any particular injury to its legal rights by itself. Lucid generally claims that its right to engage in the lawful business of selling new motor vehicles directly to consumers has been violated, but it is enforcement of the Direct Sales Prohibition (which prohibits manufacturers and their affiliates from selling new motor vehicles directly to consumers in the state) that is the source of that asserted legal injury. OCGA § 10-1-664.1(a)(8), which is an exception to the Direct Sales Prohibition that does not apply to Lucid, has no impact on Lucid's asserted right to sell new vehicles directly to consumers in the state. And Lucid has not identified any other infringement of an asserted legal right of Lucid's that results from enforcement of OCGA § 10-1-664.1(a)(8)'s alleged unconstitutional feature. See *Wasserman*, 320 Ga. at 642–43

45

(explaining that a plaintiff cannot "challenge a statute on constitutional grounds unless he c[an] show that its enforcement is an infringement upon his right of person or property, and that such infringement results from the unconstitutional feature of the statute upon which he bases his attack" (quotation marks omitted)). Accordingly, Lucid lacks standing to challenge the constitutionality of OCGA § 10-1-664.1(a)(8) by itself.[22] Cf. *Republican Nat'l Comm.*, 321 Ga. at 787–88 (holding that individual voters lacked standing to challenge rules concerning poll watchers and daily reporting of votes, where the individual voters had not shown that the "rules would ever infringe on the right to vote" and "identif[ied] no other private right that those two rules violate").

By contrast, Lucid has constitutional standing to challenge the enforcement of the 2015 amendment to the Motor Vehicle Franchise Practices Act, Ga. L. 2015, Act 159. As explained above, that

---

[22] We express no opinion about whether OCGA § 10-1-664.1(a)(8) may be relevant to Lucid's claims that the Direct Sales Prohibition violates Lucid's rights under the Equal Protection and Due Process Clauses, should the trial court reach that question after further considering whether Paragraph II(c) bars Lucid's equal protection and due process claims.

amendment simultaneously created the Direct Sales Prohibition (which is the source of Lucid's asserted legal injury) by redefining "[n]ew motor vehicle" and created a carveout from the Direct Sales Prohibition for Tesla. See Ga. L. 2015, Act 159, §§ 1 & 2. But the trial court did not consider whether it was possible for Lucid to prove within the framework of the complaint that the 2015 amendment as a whole, or a non-severable component of it, is a "special law … for which provision ha[d] been made by an existing general law" (namely by the then-existing, unamended version of OCGA § 10-1-664.1), in violation of Paragraph IV(a), or a "special law relating to the rights or status of private persons," in violation of Paragraph IV(c).

Accordingly, although we affirm the trial court's dismissal of Lucid's Paragraph IV claim to the extent that Lucid directly and separately challenged enforcement of the Direct Sales Prohibition codified in OCGA § 10-1-664.1(a) and (c) and the exception for Tesla codified in OCGA § 10-1-664.1(a)(8), we vacate the trial court's dismissal of Lucid's Paragraph IV claim to the extent that Lucid

47

challenged the enforcement of the 2015 amendment (Ga. L. 2015, Act 159). And we remand the case for further consideration of Lucid's Paragraph IV challenge to the enforcement of the 2015 amendment.

* * *

As explained above, we affirm in part and vacate in part the trial court's dismissal of Lucid's Paragraph IV claim. We vacate the trial court's dismissal of Lucid's due process and equal protection claims. And we remand the case for further proceedings consistent with this opinion.

*Judgment affirmed in part and vacated in part, and case remanded with direction. All the Justices concur, except Warren, P. J., not participating.*